S. Larry CROOKSTON, Randi L. Crookston, and Anna W. Drake, Trustee of the Estate of Spencer Larry Crookston and Randi Lynn Crookston, Plaintiffs and Appellees,

v.

FIRE INSURANCE EXCHANGE, a California corporation, Defendant and Appellant.

No. 880034.

Supreme Court of Utah.

June 28, 1991.

Rehearing Denied Aug. 12, 1991.

L. Rich Humphreys, M. Douglas Bayly, Salt Lake City, for plaintiffs and appellees.

Philip R. Fishler, Stephen J. Trayner, Salt Lake City, and Frank A. Roybal, Bountiful, for defendant and appellant.

ZIMMERMAN, Justice:

Fire Insurance Exchange ("Fire Insurance") appeals a jury verdict awarding Spencer Larry Crookston and Randi Lynn Crookston (collectively referred to as "the Crookstons") and Anna W. Drake, trustee of the Crookstons' estate, compensatory damages of $815,826 and punitive damages of $4,000,000 on various theories arising out of Fire Insurance's failure to pay in full a claim for property damage caused by the collapse of the Crookstons' home while under construction. Fire Insurance also appeals the trial court's award of $175,000 in attorney fees and $11,126 in costs to the Crookstons.

The jury found that Fire Insurance breached its contract of insurance, including the implied covenant of good faith and fair dealing recognized in *Beck v. Farmers Ins. Exch.*, 701 P.2d 795 (Utah 1985); intentionally inflicted emotional distress upon the Crookstons; committed fraud and misrepresentation in its handling of the Crookstons' claims; and was the proximate cause of the damages suffered by the Crookstons. Fire Insurance argues that myriad substantive and procedural errors were committed which require reversal of the verdict and/or the damage awards. We

find no reason to reverse on the issue of Fire Insurance's liability. We also uphold the trial court's determination that the compensatory damages are supported by the evidence and well within the discretion of the jury. However, we vacate the trial court's denial of a motion for a new trial on grounds that the punitive damage award was excessive and remand for further consideration consistent with this opinion.

On appeal, we recite the facts in the light most favorable to the jury's verdict. *E.g., State v. Verde,* 770 P.2d 116, 117 (Utah 1989); *Von Hake v. Thomas,* 705 P.2d 766, 769 (Utah 1985). Larry and Randi Crookston owned a vacant lot in Davis County, Utah, on which they wanted to build an "earth" home, i.e., a house constructed partially underground to take advantage of the natural heating and cooling effects of the earth. In December of 1980, they approached Rocky Mountain State Bank for a construction loan in the amount of $60,000. The bank approved the loan with the stipulation that the Crookstons obtain insurance naming the bank as the loss payee. The Crookstons obtained such a policy from Fire Insurance with a maximum coverage of $67,000. The policy named the Crookstons as the insureds and the bank as the loss payee.

In December of 1981, the home, which was 90 percent completed, collapsed. The Crookstons filed a claim with Fire Insurance that month, and an adjustor was assigned the claim. A few months passed during which no progress was made on the claim. The Crookstons then hired an attorney, Ralph Klemm, to represent them in the claim adjustment. Klemm assisted Fire Insurance in obtaining bids to have the home repaired. By the end of March of 1982, Fire Insurance had received bids from two contractors: one in the amount of $50,951, and another in the amount of $49,600. In April of 1982, Fire Insurance's regional office extended settlement authority in the amount of $49,443. In May of 1982, the adjustor obtained another bid from an architect in the amount of $74,000.

Later in May, Fire Insurance replaced the original adjustor with one more experienced. The new adjustor, Alan Clapperton, commissioned an engineer to do an analysis limited to structural damage. The engineer was not informed by Clapperton that his report would be the basis for a bid to reconstruct the house. Clapperton then requested a bid to rebuild the home from an inexperienced contractor. Clapperton provided this contractor with a copy of the engineer's analysis, representing that the engineer's limited analysis encompassed the entire damage to be repaired. On June 14, 1982, the contractor bid $27,830.60 to repair the home. Clapperton immediately made an appointment to meet with a bank officer on June 16th to discuss settlement. On the morning of the 16th, Clapperton received a call from Ralph Klemm, the Crookstons' attorney, asking about the status of any settlement. Clapperton told Klemm that he needed a little more time and would be getting back to him soon with a settlement proposal. Clapperton said nothing about the bid he had received two days earlier or of the meeting he had scheduled with the bank for later that same day.

At the meeting with the bank, Clapperton did not disclose the fact that three other bids, all substantially higher, had been obtained, nor did he reveal that the $27,830.60 bid was based on an engineer's appraisal limited to structural damage only. The bank officer agreed to settle for slightly more than $32,000, the amount of the low bid plus an approximation of the interest that had accrued on the Crookston loan since the collapse. Knowing full well that the $27,830.60 bid was substantially lower than any other bid, Clapperton insisted that the bank accept a settlement check made out only to the bank, not jointly to the bank and the Crookstons, and that the bank execute a proof of loss form releasing Fire Insurance from any further liability on the claim. The settlement was effected that same day, and all necessary documents were signed and exchanged.

The Crookstons' attorney called the bank later on June 16th. At that time, Klemm was told that the bank had just settled the

claim with Fire Insurance. Klemm immediately called Clapperton, who affirmed that Fire Insurance had settled all claims under the policy with the sole loss payee, the bank. Clapperton also stated that the insureds, the Crookstons, did not have to be included in the settlement, that nothing more was owing, and that he was closing his file.

Klemm called the bank and discussed the Crookstons' situation. He learned that the bank intended to pursue a deficiency claim against the Crookstons for the balance due on the $60,000 loan that was not paid by the insurance settlement. Because the Crookstons lacked the means to pay off the loan, the bank threatened foreclosure. In order to avoid additional interest, attorney fees, and costs, the Crookstons deeded the property on which the earth home stood to the bank in lieu of foreclosure and then declared bankruptcy.

In February of 1983, the Crookstons filed a suit against the bank and Fire Insurance. As the pleadings ultimately stood, the Crookstons alleged causes of action against Fire Insurance for breach of contract, breach of the covenant of good faith and fair dealing, intentional infliction of emotional distress, and misrepresentation and fraud. Against the bank, the Crookstons asserted claims for breach of a covenant of good faith and fair dealing, breach of fiduciary duty, misrepresentation and fraud, and intentional infliction of emotional distress. They sought actual and punitive damages against both Fire Insurance and the bank. Fire Insurance and the bank cross-claimed against each other, asserting rights of contribution.

In January of 1987, Fire Insurance moved for summary judgment based on a clause in the insurance contract requiring that any actions against the company be brought within one year of the date of loss. Fire Insurance argued that because the date of loss was December of 1981, when the house collapsed, and the action was brought fourteen months later, in February of 1983, the action should have been barred. The trial court denied the motion. Fire Insurance also moved to bifurcate the proceedings, requesting that the cause of action for breach of contract be separated from the remaining causes of action, which motion the trial court also denied.

Five days before trial, on a Thursday afternoon, the Crookstons agreed to settle with the bank. The afternoon of the next day, a stipulation regarding the settlement was executed, and the bank served and filed a motion for summary judgment, seeking its dismissal from the action. This motion was granted.

The case then proceeded to trial against Fire Insurance. After a six-day trial, the jury awarded $815,826 in compensatory damages and $4,000,000 in punitive damages. Although the jury's award of compensatory damages was not broken down further, testimony at trial attributed $323,399 of the $815,826 to economic loss, making the remaining $492,427 apparently attributable to emotional distress and loss of financial reputation. Fire Insurance filed a motion for judgment notwithstanding the verdict, new trial, or remittitur, which the court denied on December 30, 1987. On January 11, 1988, the court entered an additional judgment against Fire Insurance awarding the Crookstons attorney fees of $175,000 and expenses of $11,126. Fire Insurance then filed this appeal.

Fire Insurance claims as follows: (i) the trial court erred in granting the bank's summary judgment motion, which was both procedurally and substantively flawed; (ii) the trial court erred in refusing to hold the action barred by the one-year limitation period in the policy; (iii) the jury instructions regarding fraud were erroneous; (iv) the evidence is insufficient to support a finding of either intentional infliction of emotional distress or fraud; (v) attorney fees should not have been awarded; and (vi) the compensatory and punitive damages were excessive under Utah law and also violated constitutional notions of due process and the prohibition of excessive fines. We will address only the dispositive issues.

Initially, we consider the claim that the trial court erred in granting the bank summary judgment on Fire Insurance's cross-

claim for contribution. As noted earlier, after settling with the Crookstons, the bank filed a summary judgment motion four days prior to trial. In support of the motion, the bank made several arguments: (i) it should be dismissed from the case because it had settled with the Crookstons; (ii) it was abandoning any claim for contribution against Fire Insurance; and (iii) there was no legal basis upon which Fire Insurance could recover against the bank on its cross-claim for contribution because contribution is not available to one found to have committed an intentional tort or a breach of contract, the only two theories under which the Crookstons were then proceeding against Fire Insurance.

The court held a hearing on the summary judgment motion on May 26, 1987, the Tuesday following the motion's filing and the morning of trial, which was four calendar days but only one business day after the motion was filed with the court.[1] At the time of the hearing, Fire Insurance had not filed any opposition papers. Fire Insurance argues that the court was incorrect on the law of contribution and that the summary judgment motion was procedurally flawed because it was filed late. *See* Utah R.Civ.P. 56(c). We first consider the procedural challenge.

■■■ Utah Rule of Civil Procedure 56(c) requires at least ten days' notice before a hearing on a motion for summary judgment. Utah R.Civ.P. 56(c). In this case, only three days intervened between the

filing of the motion and the hearing, two of which were weekend days and the other, a legal holiday. Obviously, a technical violation of rule 56(c) occurred. Because a rule 56(c) violation does not divest the court of jurisdiction over the motion, *see Walker v. Rocky Mountain Recreation Corp.,* 29 Utah 2d 274, 279, 508 P.2d 538, 541 (1973); *Western States Thrift & Loan Co. v. Blomquist,* 29 Utah 2d 58, 61–62, 504 P.2d 1019, 1021 (1972), it has the power to grant summary judgment despite a rule 56(c) violation. However, such a violation will void the grant unless the violation amounts to harmless error.[2] *See* Utah R.Civ.P. 61; *Blomquist,* 29 Utah 2d at 62, 504 P.2d at 1021 (summary judgment upheld where time violation did not adversely affect defendant's rights).

■■■ The harmless error analysis proceeds under Utah Rule of Civil Procedure 61[3] and *State v. Verde,* 770 P.2d 116 (Utah 1989).[4] "Harmless error" is defined in *Verde* as an error that is "sufficiently inconsequential that we conclude there is no reasonable likelihood that the error affected the outcome of the proceedings." *Verde,* 770 P.2d at 120; *accord, e.g., State v. Knight,* 734 P.2d 913, 919–20 (Utah 1987) (explaining meaning of "reasonable" probability or likelihood). Put in other words, an error is harmful only if the likelihood of a different outcome is sufficiently high as to undermine our confidence in the verdict. *Knight,* 734 P.2d at 920. Our task, then, is

[N]o error or defect in any ruling or order or in anything done or omitted by the court or by any of the parties, is ground for granting a new trial or otherwise disturbing a judgment or order, unless refusal to take such action appears to the court inconsistent with substantial justice. The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties.
Utah R.Civ.P. 61.

---

1. The intervening weekend was the Memorial Day weekend.

2. Recently, the Utah Court of Appeals in *Gillmor v. Cummings,* 806 P.2d 1205 (Utah Ct.App.1991), reversed a grant of summary judgment holding that the trial court committed error when it ruled on the motion six days before the time to respond to the moving party's motion to strike supporting affidavits had expired. *Gillmor,* however, even if accepted as an accurate statement of Utah law, is inapposite here because no harmful error analysis was applied in that case. Instead, the court of appeals apparently assumed prejudice consistent with rule 61. It then remanded to the trial court because it was "unable to determine from the record ... what the court actually considered in granting the summary judgment...." *Id.* at 18 n. 3.

3. Utah Rule of Civil Procedure 61 states:

4. In *Verde,* we discussed harmless error in depth and attempted to articulate one harmless error standard that harmonizes the various rules which state the concept in different terms. One of the rules we considered in *Verde* is rule 61. *State v. Verde,* 770 P.2d 116, 120–21 (Utah 1989).

to determine whether a different outcome on the summary judgment motion would have had a reasonable probability of affecting the outcome of the case.

For purposes of the decision before us, the law of contribution is governed by section 78–27–39 of the Code. Utah Code Ann. § 78–27–39 (1973) (repealed 1986). That section provides that a right of contribution among tort-feasors is recognized only after one tort-feasor has paid to discharge a liability common to two or more tort-feasors "or more than his prorata share thereof." *Id.*[5] Fire Insurance contends that an adequate time to respond would have permitted it to persuade the trial court that Fire Insurance was entitled to contribution from the bank for damages caused by a breach of contract or an intentional tort they jointly committed.

▮ Even if we assume without deciding that Fire Insurance is correct, the trial court's error would be harmful only if Fire Insurance can show that the jury awarded damages against it for which there is a reasonable probability that Fire Insurance could have persuaded the jury that it was entitled to contribution from the bank. Here, the jury was instructed that it could award plaintiffs only such damages as Fire Insurance proximately caused.[6] The jury was not told that it could award plaintiffs any damages to be paid by Fire Insurance for which the bank was responsible. And there is nothing in the record to persuade us that the jury violated its instruction and awarded any damages against Fire Insurance that were caused by the bank. There is not a reasonable likelihood that a jury would have found the bank to owe Fire Insurance contribution. Therefore, whether a right of contribution actually existed between the bank and Fire Insurance is of no consequence, and any error committed

by the trial court in proceeding to consider the inadequately noticed motion for summary judgment is harmless.

We next address Fire Insurance's contention that the Crookstons' claim was barred by the clause in the insurance contract stating, "No suit or action on this policy for the recovery of any claim shall be sustainable in any court of law or equity ... unless commenced within 12 months next after inception of the loss." This lawsuit was filed in February of 1983, fourteen months after the house collapsed in December of 1981. We have previously said that contractual limitations on the time in which to bring actions on insurance contracts " 'if reasonable, are valid, binding and enforceable,' " although looked upon with some disfavor. *Hoeppner v. Utah Farm Bureau Ins. Co.*, 595 P.2d 863, 865 (Utah 1979) (quoting *Anderson v. State Farm Fire & Casualty Co.*, 583 P.2d 101, 103 (Utah 1978)); *see also Hibdon v. Truck Ins. Exch.*, 657 P.2d 1358, 1359 (Utah 1983); *Anderson v. Beneficial Fire & Casualty Co.*, 21 Utah 2d 173, 175, 442 P.2d 933, 934 (1968). However, we have not addressed the question of whether such standard form clauses operate to limit the time in which one may bring an action grounded in tort as opposed to breach of contract.

There is a split of authority on the question of whether a limitation provision such as that contained in the contract of insurance at issue here applies to bar an insured from suing for an insurer's tortious conduct. Those courts holding the provision effective to bar such a suit reason that the tortious conduct of the insurer arises out of its obligations under the provisions of the policy and, therefore, it would be inequitable not to give effect to the limitation clause. *See, e.g., Barrow Dev. Co. v. Ful-*

---

5. Section 78–27–39 provides:

(1) The right of contribution shall exist among joint tort-feasors, but a joint tort-feasor shall not be entitled to a money judgment for contribution until he [or she] has, by payment, discharged the common liability or more than his [or her] prorata share thereof. Utah Code Ann. § 78–27–39 (1973) (repealed 1986).

6. Instruction No. 37 states in full:

You are not to award damages for any injury or condition from which the plaintiffs may have suffered, or may now be suffering, unless it has been established by a preponderance of the evidence in the case that such injury or condition was proximately caused by the conduct of defendant FIRE INSURANCE EXCHANGE.

*ton Ins. Co.*, 418 F.2d 316, 319 (9th Cir. 1969); *Zieba v. Middlesex Mut. Assurance Co.*, 549 F.Supp. 1318, 1323 (D.Conn.1982); *Modern Carpet Indus., Inc. v. Factory Ins. Ass'n*, 125 Ga.App. 150, 152, 186 S.E.2d 586, 587 (1971).

Those courts holding standard form limitations of the kind found in the Fire Insurance policy not applicable to tortious conduct reason that tort causes of action are not actions on the insurance contract but separate actions arising from the breach of a positive legal duty imposed by law. *See, e.g., Davis v. State Farm Fire & Casualty Co.*, 545 F.Supp. 370, 372 (D.Nev.1982); *Asher v. Reliance Ins. Co.*, 308 F.Supp. 847, 852–53 (N.D.Cal.1970); *Murphy v. Allstate Ins. Co.*, 83 Cal.App.3d 38, 147 Cal. Rptr. 565, 571 (1978); *Wabash Valley Protective Union v. James*, 8 Ind.App. 449, 35 N.E. 919, 920 (1893); *Hoskins v. Aetna Life Ins. Co.*, 6 Ohio St.3d 272, 279, 452 N.E.2d 1315, 1320 (1983); *Plant v. Illinois Employers Ins.*, 20 Ohio App.3d 236, 237–38, 485 N.E.2d 773, 775 (1984); *Lewis v. Farmers Ins. Co.*, 681 P.2d 67, 69 (Okla. 1983); *Warmka v. Hartland Cicero Mut. Ins. Co.*, 136 Wis.2d 31, 35, 400 N.W.2d 923, 925 (1987).

■ In the context of a contract of insurance, we prefer this latter line of cases. By reading the "no suit or action on this policy" language as not covering tort, we are simply following the usual rule by which we narrowly construe a standard form contractual limitation provision that is not bargained for and is drafted by the insurance company for its own benefit, es-pecially where that provision takes from the other party rights conferred by existing statutes.[7] *See, e.g., LDS Hosp. v. Capitol Life Ins. Co.*, 765 P.2d 857, 859 (Utah 1988); *Browning v. Equitable Life Assurance Co.*, 94 Utah 570, 575, 80 P.2d 348, 351 (1938); *Valley Bank & Trust v. U.S. Life Title Ins. Co.*, 776 P.2d 933, 936 (Utah Ct.App.1989); *Draughon v. CUNA Mut. Ins. Soc.*, 771 P.2d 1105, 1108–09 (Utah Ct.App.1989) (limitation must use clear language).

■ Because we conclude that the Crookstons' tort causes of action are not barred by the insurance contract's limitations provision, and because we have sustained the trial court's decision to uphold the jury's finding of the tort of fraud and all damages awarded by the jury can be sustained upon the finding of fraud, we need not address the question of which of the other causes of action asserted by the Crookstons may be barred by the contractual limitation.[8]

We next consider Fire Insurance's challenge to the jury's finding that Fire Insurance committed fraud. Fire Insurance contends that the jury instruction describing the fraud cause of action was erroneous. It also argues that even if the jury was properly instructed, there was insufficient evidence to support the finding of fraud.

We first address Fire Insurance's claim that instruction 28 omitted or misstated three of the nine elements of fraud required in Utah. *See generally Pace v. Parrish*, 122 Utah 141, 144–45, 247 P.2d 273, 274–75 (1952). Fire Insurance con-

---

7. See section 78–12–23 of the Utah Code, which confers a six-year limitation on actions pertaining to written instruments. Utah Code Ann. § 78–12–23 (1987). We note that section 31A–21–313, which was enacted in 1986, specifies a three-year limit within which to bring any "action on a written policy or contract of insurance." Utah Code Ann. § 31A–21–313 (1991). The section also provides that "no insurance policy may ... limit the time for beginning an action on the policy to a time less than authorized by statute." Utah Code Ann. § 31A–21–313(3)(a) (1991). Although section 31A–21–313 does not apply to these facts, it does govern actions arising after the section's enactment.

8. We note that the covenant of good faith and fair dealing is an implied contractual provision, and a cause of action for its breach sounds in contract. *Beck v. Farmers Ins. Exch.*, 701 P.2d 795, 798 (Utah 1985). However, we have never addressed the question of whether the time for bringing an action for such a breach runs from the date of the harm caused by the breach of the covenant or from the date of the event triggering the insured's alleged liability on the policy. If it runs from the former date, then the contractual limitation would not have barred the Crookstons' suit on that claim because the suit was filed less than twelve months after the challenged settlement with the bank.

cedes that no objection was raised at trial to instruction 28, as is required by Utah Rule of Civil Procedure 51. That rule states in pertinent part, "No party may assign as error the giving or the failure to give an instruction unless he [or she] objects thereto." Utah R.Civ.P. 51. Fire Insurance would have us consider the propriety of the instruction anyway, relying on another part of rule 51, which states that "notwithstanding the foregoing requirement, the appellate court, in its discretion and in the interests of justice, may review the giving of or failure to give an instruction." *Id.*

 We hold that discretionary review is not appropriate in this case. The last clause of rule 51 does permit us to review instructional errors in the interests of justice. "However, 'it is incumbent upon the aggrieved party to present a persuasive reason' for exercising that discretion ... and this requires 'showing special circumstances warranting such a review.' " *Hansen v. Stewart,* 761 P.2d 14, 17 (Utah 1988) (citations omitted). In *State v. Eldredge,* 773 P.2d 29, 35–36 (Utah 1989), we described the content of the analogous "manifest injustice" exception to Utah Rule of Criminal Procedure 19(c)'s requirement that any instructional errors raised on appeal be first called to the trial court's attention by proper objection. We held that the term "manifest injustice" embodied the concepts of "plain error." *See Eldredge,* 773 P.2d at 35–36. The last clause of rule 51 of the Utah Rules of Civil Procedure embodies the same concept. *See State v. Verde,* 770 P.2d 116, 120–22 (Utah 1989). In the present case, Fire Insurance has not begun to make the showing required by rule 51. Here, there was simple failure of

trial counsel to preserve a narrow technical objection to an instruction. *See Hansen v. Stewart,* 761 P.2d at 17. Therefore, we decline to consider its challenge to the fraud instruction.

 We next address Fire Insurance's contention that the evidence was insufficient to support a finding of fraud and that the trial court erred in refusing to grant a new trial or judgment notwithstanding the verdict ("j.n.o.v."). Before we consider this contention, we note the standard of review. In deciding whether to grant a new trial, a trial court has some discretion, and we reverse only for abuse of that discretion. In passing on a motion for a j.n.o.v., however, a trial court has no latitude and must be correct. *Id.*[9] Appellate review of a trial court's *denial* of either motion based on a claim of insufficiency of the evidence, however, is governed by one standard because of the differing degrees of discretion we accord trial courts in ruling initially on these motions. *Id.* Under that standard, we reverse only if, viewing the evidence in the light most favorable to the prevailing party, the evidence is insufficient to support the verdict. *Hansen,* 761 P.2d at 17; *King v. Fereday,* 739 P.2d 618, 620–21 (Utah 1987); *Price–Orem Inv. Co. v. Rollins, Brown, & Gunnell, Inc.,* 713 P.2d 55, 57–58 (Utah 1986).

 To demonstrate that the evidence is insufficient to support the jury verdict, the one challenging the verdict must marshal the evidence in support of the verdict and then demonstrate that the evidence is insufficient when viewed in the light most favorable to the verdict. *E.g., Morgan v. Quailbrook Condominium Co.,*

---

**9.** In citing *Hansen v. Stewart,* 761 P.2d 14 (Utah 1988), we note one point in which the lead opinion may be misleading. It states that "a new trial may be granted whenever there is evidence that would have permitted entry of a judgment for the losing party." *Id.* at 17. This statement is an accurate statement of the standard to be applied by an *appellate* court reviewing a trial court's *grant* of a new trial under rule 59(a)(6). Read as a statement of the standard to be applied by a trial court addressing a new trial motion, it is inaccurate. A trial court cannot grant a new trial if there is sufficient evidence to support a verdict for either party and the judge merely disagrees with the judgment of

the jury. Mere disagreement is not a sufficient basis on which to set aside a verdict and order a new trial. *King v. Fereday,* 739 P.2d 618, 621 (Utah 1987); *Price–Orem Inv. Co. v. Rollins, Brown, & Gunnell, Inc.,* 713 P.2d 55, 57–58 (Utah 1986); *see also* C. Wright & A. Miller, *Federal Practice & Procedure* § 2803 (1973). Rather, a trial judge may properly grant a new trial under rule 59(a)(6) when he or she can reasonably conclude that the verdict is clearly against the weight of the evidence or that there is insufficient evidence to justify the verdict as more fully explained in *Goddard v. Hickman,* 685 P.2d 530 (Utah 1984); *see also Wellman v. Noble,* 12 Utah 2d 350, 366 P.2d 701 (1961).

704 P.2d 573, 577 n. 3 (Utah 1985); *Scharf v. BMG Corp.*, 700 P.2d 1068, 1070 (Utah 1985). Here, Fire Insurance has made no attempt to marshal the evidence in support of the jury finding of fraud. In fact, all Fire Insurance has done is argue selected evidence favorable to its position. That does not begin to meet the marshalling burden it must carry. We do not sit to retry the facts. *See Cambelt Int'l Corp. v. Dalton*, 745 P.2d 1239, 1242 (Utah 1987); *Von Hake v. Thomas*, 705 P.2d 766, 769 (Utah 1985). This failure alone is grounds to reject Fire Insurance's attack on the fraud finding. *E.g., Hansen*, 761 P.2d at 17; *Ashton v. Ashton*, 733 P.2d 147, 150 (Utah 1987); *Hagan v. Hagan*, 810 P.2d 478, 483 (Utah Ct.App.1991).

Even if we were to review the record evidence for support, we would reject Fire Insurance's attack. The Crookstons alleged seven theories under which fraud could be found, and a casual review of the record indicates that there is ample evidence on at least one of the Crookstons' fraud theories to sustain the verdict.

We have previously restated the elements of fraud as follows:

(1) That a representation was made;

(2) concerning a presently existing material fact;

(3) which was false;

(4) which the representor either (a) knew to be false, or (b) made recklessly, knowing that he [or she] had insufficient knowledge upon which to base such representation;

(5) for the purpose of inducing the other party to act upon it;

(6) that the other party, acting reasonably and in ignorance of its falsity;

(7) did in fact rely upon it;

(8) and was thereby induced to act;

(9) to his [or her] injury and damage.

*Pace v. Parrish*, 122 Utah 141, 144–45, 247 P.2d 273, 274–75 (1952); *see also Mikkelson v. Quail Valley Realty*, 641 P.2d 124, 126 (Utah 1982); *Kohler v. Garden City*, 639 P.2d 162, 166 (Utah 1981); *Wright v. Westside Nursery*, 787 P.2d 508, 512 (Utah Ct.App.1990). *See generally* 37 Am.Jur.2d *Fraud and Deceit* §§ 432–436 (1968). We also stated in *Pace* that the elements of fraud must be proven by "clear and convincing evidence." *Pace*, 122 Utah at 143, 247 P.2d at 274.

One of the seven theories upon which the Crookstons relied was that on June 16, 1982, Clapperton misrepresented to Klemm that Fire Insurance was not yet in a position to settle the claims and that he would include the Crookstons in any settlement negotiation. Clapperton made these representations knowing that he was prepared to settle with the bank that very day. There is ample evidence to support these factual claims.

As for Fire Insurance's challenge to the jury's finding that reliance was reasonable and that the alleged misrepresentation did not damage the Crookstons, the record substantiates that the jury could have found by clear and convincing evidence that the Crookstons relied on Clapperton's representation that the company was not ready to settle and were induced to inaction thereby, with the result that Fire Insurance was able to settle the matter with the bank without their participation for an unfairly low amount. The inadequacy of the amount paid the bank by Fire Insurance set in motion the events that ultimately resulted in the Crookstons' bankruptcy and the ensuing harm. Therefore, we find no error in the denial of both the j.n.o.v. and the new trial motion on this ground.

Fire Insurance's next claim is that the award of compensatory and punitive damages violates the ban on excessive fines and the due process provision of the Utah Constitution. *See* Utah Const. art. I, § 9; Utah Const. art. I, § 7.[10] Fire Insurance did not, however, raise these arguments before the trial court and has therefore waived any right to present them on

---

**10.** Article I, section 9 of the Utah Constitution provides:

"Excessive bail shall not be required; excessive fines shall not be imposed; nor shall cruel and unusual punishments be inflicted. Persons arrested or imprisoned shall not be treated with unnecessary rigor." Utah Const. art. I, § 9. Article I, section 7 provides: "No person shall be deprived of life, liberty or property, without due process of law." Utah Const. art. I, § 7.

appeal.[11] *See, e.g., Ream v. Fitzen,* 581 P.2d 145, 148–49 (Utah 1978); *Bullock v. Joe Bailey Auction Co.,* 580 P.2d 225, 228 (Utah 1978); *Edgar v. Wagner,* 572 P.2d 405, 407 (Utah 1977); *State Road Comm'n v. Larkin,* 27 Utah 2d 295, 300, 495 P.2d 817, 821 (1972).

Fire Insurance also attacks the jury's verdict under rule 59(a)(5) of the Utah Rules of Civil Procedure. That rule provides that a trial court can grant a new trial if the damages awarded are "excessive [in amount] ... appearing to have been given under the influence of passion or prejudice." Utah R.Civ.P. 59(a)(5). Fire Insurance contends that both the compensatory and the punitive damage awards meet this test and that the trial court erred in denying its motion for a new trial or a remittitur. In support of its contention, Fire Insurance relies on a number of our prior decisions in which we reduced or reversed awards of compensatory or punitive damages on grounds they were "excessive." *See, e.g., First Security Bank of Utah v. J.B.J. Feedyards, Inc.,* 653 P.2d 591, 598–99 (Utah 1982) (upholding total compensatory damages of $36,000 but cutting punitives from $100,000 to $50,000 and compensatories for emotional distress from $25,000 to $12,500).[12]

Fire Insurance correctly points out that in the present case, the amount of both compensatory and punitive damages awarded is far greater than the awards reduced in many prior cases and that the ratio of punitives to compensatories is higher than has been sustained in any of our prior cases where large dollar awards were made. Essentially, Fire Insurance contends that the results in those cases, when considered together, amount to a determination of what constitutes "excessive" damages as a matter of law, damages that we have concluded must have been the result of passion or prejudice. Fire Insurance asks that even if we sustain the finding of liability for fraud, we make a reduction in the amount of both compensatory and punitive damages. Alternatively, it asks that we remand for a new trial on the issue of damages.

In deciding whether Fire Insurance's claim has any merit, we have reviewed

---

**11.** Regarding the claimed due process violations, we note that the United States Supreme Court recently held that the procedures followed under Alabama law in awarding and reviewing punitive damage awards were adequate and did not violate the federal due process provision. *See Pacific Mutual Ins. Co. v. Haslip,* —— U.S. ——, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991); *see also Browning–Ferris Indus. v. Kelco Disposal, Inc.,* 492 U.S. 257, 281, 109 S.Ct. 2909, 2923, 106 L.Ed.2d 219, 242 (1989) (Brennan, J., concurring); *Bankers Life & Casualty Co. v. Crenshaw,* 486 U.S. 71, 88, 108 S.Ct. 1645, 1655–56, 100 L.Ed.2d 62 (1988) (O'Connor, J., concurring). In *Hammond v. City of Gadsden,* 493 So.2d 1374 (Ala.1986), Alabama implemented a procedure requiring a post-trial hearing in cases involving punitive damages wherein the judge must state on the record the reasons for revising or upholding the jury's award. *See generally* D. Blan & J. Hart, *The Constitutionality of Punitive Damages,* December 1990 For the Defense 12, 20. The procedure has now largely been enacted by statute. *See* Ala.Code § 6–11–23 (Supp. 1990). The standards followed by courts of this state in the past for awarding punitive damages, and certainly the standards we today adopt for review of punitive damage awards, are at least as stringent as, if not more stringent than, those followed in Alabama.

**12.** Other cases in which we have reduced or vacated and remanded damage awards include *Jensen v. Pioneer Dodge Center, Inc.,* 702 P.2d 98 (Utah 1985) (upholding compensatories of $1,400 but remanding for reduction of punitives of $100,000 as grossly disproportionate); *Bundy v. Century Equip. Co.,* 692 P.2d 754 (Utah 1984) (remanding for reduction a $25,000 punitive award as grossly disproportionate to compensatory damages of $2,133 where court found a low degree of malice and there were no findings as to defendant's wealth); *Nelson v. Jacobsen,* 669 P.2d 1207 (Utah 1983) (compensatory damages of $59,600 upheld but punitive award of $25,000 reversed for failure to establish defendant's net worth); *Cruz v. Montoya,* 660 P.2d 723 (Utah 1983) (reducing punitives from $12,000 to $6,000 based on lack of findings as to defendant's wealth where compensatories were $9,000, $7,500 of which were "soft"); *Kesler v. Rogers,* 542 P.2d 354 (Utah 1975) (reducing punitives from $10,000 to $5,000); *Prince v. Peterson,* 538 P.2d 1325 (Utah 1975) (reducing punitives already below compensatory damages with no explanation); *Nance v. Sheet Metal Workers Int'l Assoc.,* 12 Utah 2d 233, 364 P.2d 1027 (1961) (reversing $40,000 punitives entered by trial court where jury had awarded none and where there were only nominal compensatory damages); *Wilson v. Oldroyd,* 1 Utah 2d 362, 267 P.2d 759 (1954) (punitives of $25,000 reduced to $5,000 where compensatories were $50,000).

many of our prior decisions passing on claims that damage awards were "excessive." We have also reviewed many of our prior cases considering claims that a trial court had abused its discretion in granting or denying a motion for a new trial. Collectively, this review has left us dissatisfied with the state of the case law. There is little consistency either in our statements of the appropriate standard of review to be applied or in the standard we have actually applied. Sometimes, we have approached such cases as though we were reviewing a trial court's review of the verdict,[13] while at other times, we appear to have directly reviewed the verdict, ignoring any intermediate actions by the trial court.[14]

Because the standard-of-review law is confused in this area, we must attempt to clarify it before considering the merits of Fire Insurance's claim. Today, we attempt to bring some order to the processes used in determining and reviewing damage awards. We will address the relative roles of the jury, the trial court, and the appellate court. We will also address the substantive standards for determining the lawfulness of a particular award. Our discussion of the subject will be divided into three parts. First, we will address the standard of review to be applied by a trial court considering a motion that attacks the amount of a jury's damage award. Second, we will discuss the standard of review to be followed by an appellate court reviewing a trial court's decisions on a challenge to a jury's damage award. Third, we will explain the substantive standards by which the damage award is to be judged. Finally,

we will apply these standards to the decision of the trial court here.

The first part of our clarification effort requires an explanation of the standard of review to be applied by a trial court in ruling on a motion for a new trial attacking the amount of the jury's award. Initially, we note the procedural posture in which claims that a particular damage award is excessive generally come before the trial court because it is critical to understanding the relative roles of jury, trial court, and appellate court. After a jury returns a damage award in a civil case, the most common way for the losing party to challenge the amount of the award is to move for a new trial or remittitur under rule 59(a) of the Utah Rules of Civil Procedure.

Rule 59(a) provides in part:

(a) Grounds. Subject to the provisions of Rule 61, a new trial may be granted to all or any of the parties and on all or part of the issues, for any of the following causes ...:

(1) Irregularity in the proceedings of the court, jury or adverse party, or any order of the court, or abuse of discretion by which either party was prevented from having a fair trial.

(2) Misconduct of the jury....

(3) Accident or surprise, which ordinary prudence could not have guarded against.

(4) Newly discovered evidence....

(5) Excessive or inadequate damages, appearing to have been given under the influence of passion or prejudice.

(6) Insufficiency of the evidence to justify the verdict or other decision, or that it is against law.

---

13. Cases in which we seem to defer to the trial court include *Elkington v. Foust,* 618 P.2d 37, 41 (Utah 1980) (deferring to trial court stating that its action on the award lends solidarity); *Holdaway v. Hall,* 29 Utah 2d 77, 80, 505 P.2d 295, 296 (1973) ("[W]e cannot say that the trial judge abused his discretion in not further reducing the amount of punitive damages."); *DeVas v. Noble,* 13 Utah 2d 133, 140, 369 P.2d 290, 295 (1962) (action of trial court lends verity to verdict, although court speaks of reviewing jury directly); *Wellman v. Noble,* 12 Utah 2d 350, 353–54, 366 P.2d 701, 703–04 (1961) (trial court upheld if reasonable); *Saltas v. Affleck,* 99 Utah

381, 386–87, 105 P.2d 176, 178 (1941) (trial court accorded great latitude).

14. *See, e.g., Terry v. Z.C.M.I.,* 605 P.2d 314, 327–28 (Utah 1979) (reversing remittitur and reinstating original award), *rev'd on reh'g,* 617 P.2d 700 (1980); *Prince v. Peterson,* 538 P.2d at 1329 (reducing trial court award without explanation); *Falkenburg v. Neff,* 72 Utah 258, 270, 269 P. 1008, 1013 (1928) (reducing punitives of $5,000 to $1,500 where compensatories were $362.50 while stating that court defers to trial court in assessing damages except where, as here, they are so disproportionate as to be excessive as a matter of law).

(7) Error in law.

Utah R.Civ.P. 59(a).[15]

 The general rule governing the grant of a new trial is that the trial court must find at least one of the seven grounds listed in rule 59 to be met.[16] *See Hancock v. Planned Dev. Corp.*, 791 P.2d 183, 185 (Utah 1990); *Tangaro v. Marrero*, 13 Utah 2d 290, 292 n. 2, 373 P.2d 390, 391 n. 2 (1962); *Schindler v. Schindler*, 776 P.2d 84, 89–90 (Utah Ct.App.1989). In the context of a challenge to the amount of an award, two of those grounds are pertinent, subparts (5)—excessive damages—and (6)—insufficient evidence. If the court finds that a new trial is warranted on one of these grounds as to the amount of the award, it may encourage the parties to come to some mutually agreeable solution rather than incur the time and expense of a new trial. The court often does this, in the context of a damage award, by proposing a remittitur or additur to the jury's award of damages. *See Utah State Rd. Comm'n v. Johnson*, 550 P.2d 216, 217 (Utah 1976); *Ruf v. Association for World Travel Exch.*, 10 Utah 2d 249, 249, 351 P.2d 623, 623 (1960); *Bourne v. Moore*, 77 Utah 184, 186, 292 P. 1102, 1103 (1930); *Geary v. Cain*, 69 Utah 340, 347, 255 P. 416, 420 (1927); *Eleganti v. Standard Coal Co.*, 50 Utah 585, 592, 168 P. 266, 268 (1917). The parties may then accept the alteration and avoid a new trial or reject the proposal and begin anew.[17] If the party against whom

**15.** It should be noted that although many of the Utah Rules of Civil Procedure differ only slightly, if at all, from the Federal Rules of Civil Procedure, rule 59 is different. The Utah rule lists seven exclusive grounds on which a new trial may be granted. In contrast, the federal rule simply states that a new trial may be granted "for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States." Fed.R.Civ.P. 59(a)(1); *cf.* Utah R.Civ.P. 59(a).

In *Aetna Casualty & Surety Co. v. Yeatts*, 122 F.2d 350 (4th Cir.1941), the United States Court of Appeals for the Fourth Circuit provided an articulate history of rule 59, tracing it back to the 17th century. Quoting from the Pennsylvania Supreme Court, it stated:

[Ability to grant new trials] is a power to examine the whole case on the law and the evidence, with a view to securing a result, not merely legal, but also not manifestly against justice,—a power exercised in pursuance of sound judicial discretion, without which the jury system would be a capricious and intolerable tyranny.... [I]t was a power the courts ought to exercise unflinchingly.

*Id.* at 353 (quoting *Smith v. Times Publishing Co.*, 178 Pa. 481, 36 A. 296, 298 (1897)). The court continued:

[The jurors] are not, and have never been, independent of the court of which they are a part, but their verdicts must meet the approval, or at least they must not offend the sense of justice, of the presiding judge, who, as the late Justice Grier, of the supreme court of the United States, was fond of saying, was by virtue of his [or her] position "the thirteenth juror."

*Id.* (citations omitted). The court noted that Lord Mansfield had also recognized the necessity of "a power, somewhere, to grant new trials." *Id.* (quoting *Bright v. Enyon*, 1 Burrows 390 (1757)).

Finally, the court went on to explain the uniqueness of the standard of review for new trial motions due to the facts that the trial court, in reviewing the jury, must give them some deference and that the appellate court must defer to the trial judge in further reviewing the decision. Unlike directing a verdict, which a trial judge may do "only where there is no substantial evidence, [a v]erdict may be set aside and new trial granted, when the verdict is contrary to the clear weight of the evidence, or whenever in the exercise of a sound discretion the trial judge thinks this action necessary to prevent a miscarriage of justice." *Id.* at 354 (citations omitted).

Although the Fourth Circuit's review was related to the development of the federal rule, Utah's rule is based on the same rationale. Utah has simply chosen to delineate specific exclusive grounds, which the federal courts have not done. We accept the Fourth Circuit's summary in *Aetna Casualty* as largely accurate.

**16.** Those portions of Utah's rule 59 with which we are concerned date back at least to 1888, when rule 59's predecessor was part of Utah's Code of Civil Procedure. *See* 1888 Utah Laws ch. 8, § 3400. These provisions have remained largely unchanged since that time. The statute was apparently modeled after a similar California provision enacted in 1851. *See* 1851 Cal. Stat. ch. 5, § 193, at 81 (current version enacted in 1872). Utah's original version of the law, adopted in 1870, was modeled after this California provision. *See* 1870 Utah Laws ch. 7, art. 2, § 193. Although the Utah provision changed repeatedly until 1888, the 1888 version is substantially similar to that now found in rule 59 of the Utah Rules of Civil Procedure. For that reason, our review of relevant case law includes reference to many Utah decisions that antedate the adoption of the Utah Rules of Civil Procedure in 1951.

**17.** Federal courts also allow for such a procedure. "A remittitur gives the plaintiff a choice.

the motion is brought rejects the proposal, the court may then grant a new trial on the issue of damages.

■ Under our rule 59, it is well settled that, as a general matter, the trial court has broad discretion to grant or deny a motion for a new trial. *Hancock*, 791 P.2d at 184–85; *Christenson v. Jewkes*, 761 P.2d 1375, 1377 (Utah 1988); *Haslam v. Paulsen*, 15 Utah 2d 185, 186, 389 P.2d 736, 736 (1964); *Page v. Utah Home Fire Ins. Co.*, 15 Utah 2d 257, 261, 391 P.2d 290, 292–93 (1964); *Law v. Smith*, 34 Utah 394, 407, 98 P. 300, 305 (1908). The precise nature of that discretion and what constitutes an abuse, however, are not clearly stated in many of our individual cases, though perhaps it may be gleaned from a collective reading of them. In the context of a new trial motion attacking the amount of a jury verdict under subparts (5) and (6) of rule 59(a), it is the responsibility of the trial court to review the amount of the award to ensure that the jury has acted within its proper bounds. If the verdict does not satisfy the requirements of 59(a)(5) or (6), the judge must uphold the award.

■ The reason that any determination as to whether the jury exceeded its proper bounds is best made in the first instance by the trial court is that the trial judge is present during all aspects of the trial and listens to and views all witnesses. Therefore, he or she can best determine if the jury has acted with "passion or prejudice" and whether the award was too small or too large in light of the evidence. The trial judge is free to grant or deny a motion for a new trial if it is reasonable to conclude that the jury erred. *Wellman v. Noble*, 12 Utah 2d 350, 366 P.2d 701 (1961). On the other hand, the trial court cannot grant a new trial merely because it disagrees with the jury's judgment. *King v. Fereday*, 739 P.2d 618, 621 (Utah 1987); *Price–Orem Inv. Co. v. Rollins, Brown, &*

*Gunnell, Inc.*, 713 P.2d 55, 57–58 (Utah 1986); *see Saltas v. Affleck*, 99 Utah 381, 386–87, 105 P.2d 176, 178 (1940).[18]

■ If the trial court determines that a new trial is warranted and grants the motion, it should describe the basis for its decision in the record such that an appellate court can have the benefit of those reasons. In *Saltas v. Affleck*, Justice Moffat, speaking for this court, described why such a statement of reasons is necessary:

In order to eliminate speculation as to the basis of the exercise of judicial discretion in granting new trials, the record should show the reasons and make it clear the court is not invading the province of the jury. The trial court should indicate wherein there was a plain disregard by the jury of the instructions of the court or the evidence or what constituted bias or prejudice on the part of the jury. If no reasons need be given the province of the jury may be invaded at will. With no indication as to the basis for exercise of the power vested in the court to grant new trials the appeal tribunal would be left to analyze the matter from the evidence, the record, and the instructions. It would be required to search out possible reasons for agreeing or disagreeing with the trial court in the exercise of a discretion. The exercise of judicial discretion must be based upon some facts notwithstanding great latitude is accorded the trial court in such matter.

*Saltas*, 99 Utah at 386–87, 105 P.2d at 178 (citation omitted).

■ Thus, in passing on a motion for a new trial, if the trial court cannot reasonably find that the jury erred, it should deny the motion. On the other hand, if the trial court can reasonably conclude that there was insufficient evidence to justify the verdict or it is manifestly against the weight of the evidence in violation of rule 59(a)(6) or that the jury acted with passion or preju-

---

He [or she] can refuse to accept the reduced amount of damages and instead proceed to a new trial." 11 C. Wright & A. Miller, *Federal Practice and Procedure* § 2815 (1973).

**18.** *But cf. Hansen v. Stewart*, 761 P.2d 14, 17 (Utah 1989) (stating that trial judge may grant new trial whenever there is evidence to support different verdict). This statement in *Hansen* is clarified in footnote 9 of this opinion.

dice contrary to rule 59(a)(5), it may grant the motion and order a new trial.

We next address the standard of review by which an appellate court reviews a trial court decision to grant or deny a new trial motion challenging a verdict as excessive under rule 59. In reviewing the judge's ultimate decision to grant or deny a new trial, we will reverse only if there is no reasonable basis for the decision.[19] *See Wellman v. Noble*, 12 Utah 2d at 353, 366 P.2d at 703; *see also State v. Petersen*, 810 P.2d 421, 426–427 (Utah 1991). For example, even if the jury's award appears supported by substantial evidence on appeal, if the trial judge could reasonably conclude that the jury had acted in a manner covered by the grounds stated in rule 59(a)(5) or (6), an order granting a new trial will be upheld on appeal. *Wellman*, 12 Utah 2d at 354, 366 P.2d at 704. Similarly, a trial court's decision to deny a new trial will be upheld if there is a reasonable basis to support that decision.[20]

In light of the foregoing, some statements about standards of review in prior cases can be read as misleading, though not actually incorrect. For example, in *Bennion v. LeGrand Johnson Construction Co.*, 701 P.2d 1078 (Utah 1985), we stated that a "reviewing court will defer to a jury's damage award unless the award indicates that the jury disregarded competent evidence." *Id.* at 1084 (citations omitted); *see also Batty v. Mitchell*, 575 P.2d 1040, 1043 (Utah 1978). *See generally Bundy v. Century Equip. Co.*, 692 P.2d 754 (Utah 1984); *First Security Bank of Utah v. J.B.J. Feedyards, Inc.*, 653 P.2d 591 (Utah 1982). This statement of the standard, though perhaps not an inaccurate characterization of the test to be applied by

a trial court faced with a new trial motion under rule 59, is inaccurate if it purports to state the standard of review by which an appellate court determines the propriety of a trial court's decision to grant or deny a new trial. The statement can be read to mean that this court reviews the jury's action directly, when in reality we review the trial court's action for an abuse of discretion.[21] It is this type of loosely worded standard which has, over time, effectively confused the appellate court's proper role in assessing the merits of a rule 59 motion attacking a jury verdict with that of the trial judge. *E.g., Bennion*, 701 P.2d at 1083–84; *Bundy*, 692 P.2d at 758–59; *First Security*, 653 P.2d at 599; *Batty*, 575 P.2d at 1043.

Having, we hope, clarified the respective roles of the trial and appellate courts as they pertain to rule 59 attacks on jury verdicts, we now consider the merits of Fire Insurance's challenge to the amount of compensatory and punitive damages awarded by the jury. Fire Insurance contends that both compensatory and punitive damages are excessive. Because issues of law and policy differ as to each type of damages, we consider these claims separately.

We first address the compensatory damage award. Fire Insurance relies on *First Security Bank of Utah v. J.B.J. Feedyards, Inc.*, as support for its claim that the compensatory damages are excessive. The Crookstons' economic loss amounted to approximately $323,399. Fire Insurance argues that the remaining $492,427 awarded to the two Crookstons, who are no longer married, for emotional and mental distress and loss of financial reputation is excessive. Fire Insurance argues that the soft compensatory damages in this case are

---

**19.** We note that if, as a preliminary matter prior to the ultimate determination of the motion, the judge relies on legal principles which are erroneous or facts which are wholly without record support, this may also constitute grounds for reversal. *See State v. Petersen*, 810 P.2d 421, 426 (Utah 1991); *State v. Ramirez*, 817 P.2d 774, at 781 n. 3 (Utah 1991).

**20.** We note that the trial court's discretion with regard to denying a motion for a new trial or a remittitur on the issue of punitive damages is

further limited by other conditions as explained later in this opinion. *See infra* notes 24–31 and accompanying text.

**21.** We note that in *Bennion*, no new trial motion was presented to the trial court and, thus, this court was considering the issue de novo. *See Bennion v. LeGrand Constr. Co.*, 701 P.2d 1078, 1083–84 (Utah 1985). We use this statement of the standard in *Bennion* as an example simply because of the possibility that it may be misread.

analogous to the damages for emotional distress in *First Security*, which were cut from $25,000 to $12,500 on appeal. In *First Security*, this court stated that damages for emotional distress should be awarded with caution. *Id.* at 598; *see also Gumbs v. Pueblo Int'l, Inc.*, 823 F.2d 768, 773 (3d Cir.1987).

In the present case, Judge Frederick considered the excessiveness of the compensatory damages when Fire Insurance moved for a new trial or a remittitur. He concluded not only that the amount awarded was justified by both the law and the evidence, but that even a higher amount would have been appropriate. He made the following observations:

> During the course of the ten or so days that we tried the case, it was my observation that indeed we were dealing here with conduct which was pernicious, pernicious not merely in the sense of the defendant['s] having taken und[ue] advantage of the insureds, the Crookstons, in treating their claim in a high-handed fashion, but pernicious further in the sense that clear, unequivocal misrepresentations were made by agents of the defendant to the plaintiffs and to their counsel, and as if that were not sufficient, pernicious in the form of conduct, which, while it may not have been geared to create emotional harm and suffering to the plaintiffs, was, at the very least, in reckless disregard of their rights by dealing *sub rosa* with the bank and thereafter closing the file and advising the plaintiffs to file, the claim file would be closed.

In making an ultimate determination of the propriety of the award, Judge Frederick stated:

> I have reviewed my notes and I recall the evidence in the regard that I am refer-

ring to and I am not in the least persuaded that the jury in this case overstepped their [sic] bounds in awarding excessive general damages and punitive damages. On the contrary, this case, in my judgment, could well have resulted in greater damages than were awarded by the jury.

 While it is true, as we stated in *First Security*, that soft compensatory damages, i.e., for pain and suffering, must be awarded with caution, "[w]hen the determination of the jury has been submitted to the scrutiny and judgment of the trial judge, his [or her] action thereon should be regarded as giving further solidarity to the judgment." *Elkington v. Foust*, 618 P.2d 37, 41 (Utah 1980). Or, as we said in *Geary v. Cain*, 69 Utah at 358, 255 P. at 423, "[I]n case of doubt, the deliberate action of the trial court should prevail. Otherwise this court will sooner or later find itself usurping the functions of both the jury and the trial court." *Id.* These statements in *Elkington* and *Geary* are consistent with our statement of the appropriate appellate standard of review today.

 The judge's determination to deny a new trial on this issue was reasonable in light of the law and the facts. *See Doelle v. Bradley*, 784 P.2d 1176, 1178–79 (Utah 1989); *In re Estate of Bartell*, 776 P.2d 885, 886 (Utah 1989). In addition, Judge Frederick articulated support for the award in the record. Although his statements could have been more specific, they were sufficient to justify his upholding the compensatory damage award. *See Saltas*, 99 Utah at 386–87, 105 P.2d at 178. We therefore uphold the trial court's decision to deny a new trial on the question of compensatory damages.[22]

---

**22.** Although Fire Insurance also contends on appeal that the court failed to allocate attorney fees between the bank and Fire Insurance, that argument was not raised below and is therefore waived. *See State v. Anderson*, 789 P.2d 27, 29 (Utah 1990).

Fire Insurance also argues that the award here so shocks "one's conscience [as] to clearly indicate passion, prejudice, or corruption on the part of the jury." *Duffy v. Union Pacific R.R.*,

118 Utah 82, 89, 218 P.2d 1080, 1083 (1950) (citations omitted). Therefore, Fire Insurance contends that regardless of the trial court's action, this court can and should reverse or reduce the award as we did in *First Security*, 653 P.2d at 598–99; *see also Wilson v. Oldroyd*, 1 Utah 2d at 372, 267 P.2d at 764; *Duffy*, 118 Utah at 91–92, 218 P.2d at 1085. We stated in *Bundy v. Century Equip. Co.*, 692 P.2d at 760, "It is well settled that when an award of punitive damages

We next consider the claim that the punitive damage award was excessive, warranting a new trial. The jury awarded $4,000,000 in punitive damages, which Fire Insurance claims is excessive under rule 59(a)(5) for the same reasons it argued that the compensatory damage award is excessive. Any motion for a new trial on the question of punitive damages requires that the trial court engage in a two-part inquiry:[23] (i) whether punitives are appropriate at all, i.e., whether the evidence is sufficient to support a lawful jury finding of defendant's requisite mental state, *see* Utah R.Civ.P. 59(a)(6); *Elkington v. Foust,* 618 P.2d at 41; *Kesler v. Rogers,* 542 P.2d 354, 359–60 (Utah 1975); *Prince v. Peterson,* 538 P.2d 1325, 1329 (Utah 1975), and (ii) whether the amount of punitives is excessive or inadequate, appearing to have been given under the influence of passion or prejudice. *See* Utah R.Civ.P. 59(a)(5).

With regard to the first inquiry required of the trial judge, under our case law, punitives are allowed only where there is " 'wilful and malicious' conduct, ... or ... conduct which manifests a knowing and reckless indifference toward, and disregard of, the rights of others." *Behrens v. Raleigh Hills Hosp., Inc.,* 675 P.2d 1179,

1186 (Utah 1983) (citations omitted); *see also Rugg v. Tolman,* 39 Utah 295, 304, 117 P. 54, 57 (1911). Here, although Fire Insurance's motion for a new trial on damages did not expressly raise 59(a)(6) grounds, the trial court, in passing on the new trial motion, did conclude that there was substantial record evidence to support the jury's determination that Fire Insurance acted with reckless disregard of Crookston's rights. We also note that the jury properly found intentional fraud. Therefore, we hold that the trial court correctly concluded that Fire Insurance had acted with the mental state required for punitives.

As to the second inquiry required— whether the amount of the award was appropriate—Judge Frederick articulated the same basis for denying a new trial on the amount of punitives as he did for denying the motion on the amount of compensatories. However, punitives are, by nature, not to compensate but to punish and deter future egregious conduct and are grounded on wholly different policies. Moreover, the amount of punitives awarded here exceeds the bounds of the general pattern set by our prior decisions. Therefore, we vacate

---

is determined to be excessive or otherwise inappropriate, this court may order a new trial on the issue of damages or, in the alternative, remission of a portion of the punitive damages by the plaintiff." *Id.* While it is true that this court has the power to grant a new trial in an appropriate case, we will do so only according to the standard we adopt today, i.e., we will not substitute our judgment for that of the trial judge in making a decision on a motion for a new trial. Such a decision will be upheld if there is a reasonable basis for it based on the law and the facts. This court's statement in *Duffy* applies equally here:

> The verdict here was admittedly liberal. But the mere fact that it was more than another jury, or more than this court, might have given, or even more than the evidence justified, does not conclusively show that it was the result of passion, prejudice, or corruption on the part of the jury.

*Duffy,* 118 Utah at 89, 218 P.2d at 1083 (citations omitted).

**23.** The legal elements that must be met to sustain an award of punitive damages are now largely controlled by statute, although the statute does not apply to this case because it is

made applicable only to claims for punitive damages arising on or after May 1, 1989. 1989 Utah Laws ch. 237, § 4. Section 78–18–1 provides that before any punitive damages can be awarded, the finder of fact must be shown "by clear and convincing evidence that the acts or omissions of the tortfeasor are the result of wilful and malicious or intentionally fraudulent conduct, or conduct that manifests a knowing and reckless indifference toward, and disregard of, the rights of others." Utah Code Ann. § 78–18–1(1)(a) (Supp.1990). Therefore, a judge faced with a new trial motion must ensure that the evidence is sufficient on this point before upholding any award. These standards do not apply to punitives arising out of the operation of a motor vehicle while voluntarily intoxicated. Utah Code Ann. § 78–18–1(1)(b).

Under the statute, evidence of a defendant's wealth would be admissible only after the jury had properly determined that an award of punitive damages was proper. Utah Code Ann. § 78–18–1(2). Additionally, 50 percent of any punitives awarded in excess of $20,000 is remitted to the state treasurer after payment of attorney fees and costs. Utah Code Ann. § 78–18–1(3).

the trial court's ruling on the new trial motion and remand for reconsideration.

We will now give a detailed explanation for this portion of our holding.

As we noted earlier in this opinion, a review of our case law on punitive damages has left us dissatisfied with articulated standards for determining the amount of such awards. These standards provide little guidance for either a jury fixing the punitive damages, a trial court reviewing a challenge to the amount of such an award, or an appellate court reviewing a trial court's grant or denial of a new trial on grounds of an inadequate or excessive award. We have, however, found that the results of our prior cases dealing with challenges to damages, taken as a whole, provide patterns that furnish useful guidance as to what constitutes an excessive award. Based on these patterns, we now craft a set of guidelines that retain the advantages of flexibility but clearly set parameters beyond which awards may not go without some expressed justification. This framework should bring some predictability to this area of the law and should permit courts to more explicitly address the considerations that come into play in fixing the amount of punitive damage awards.

The stated list of factors we have said must be considered in assessing the amount of punitives to be awarded include the following seven: (i) the relative wealth of the defendant; (ii) the nature of the alleged misconduct; (iii) the facts and circumstances surrounding such conduct; (iv) the effect thereof on the lives of the plaintiff and others; (v) the probability of future recurrence of the misconduct; (vi) the relationship of the parties; and (vii) the amount of actual damages awarded. *See Bundy v. Century Equip. Co.,* 692 P.2d 754, 759 (Utah 1984); *Von Hake v. Thomas,* 705 P.2d 766, 771 (Utah 1985). Our cases have done little more than list these factors. No relative weights have been assigned them, and no standards or formulas have been established for properly evaluating them when making an award or when reviewing the propensity of a jury award. This makes such an enterprise

highly problematic for judge and jury. The finder of fact has no guidance on how much weight to give each factor or even how the factors should be assessed. And nothing suggests to the jury or the trial court that there is any sort of limit or ceiling on an award.

There is nothing uniquely vague about the punitive damage standards set out in our cases. Many other jurisdictions have quite similar lists of factors that are supposed to guide the award of punitives. *See* American College of Trial Lawyers, *Report on Punitive Damages of the Committee on Special Problems in the Administration of Justice* 3–7 (Mar. 3, 1989) [hereinafter *"Report on Punitive Damages"*] (such vague standards are problematic nationwide). And, quite predictably, the bases for awards made in those jurisdictions are no more fathomable than ours. The problem that results from this lack of guidance to juries and trial courts is exemplified by disparate ratios of punitive to actual damages that appear in separate cases involving similar conduct.

It might be argued that widely disparate punitive damage awards by separate juries for the same conduct reflects only the weakness of the jury system, not the weakness of the list-of-factors standard for measuring punitives. But that explanation fails where it is confronted with the fact that appellate courts in different jurisdictions applying essentially the same standard have reached wildly different conclusions as to what ratio of actuals to punitives is legitimate under the pure list-of-factors approach. *Compare Employers Mut. Casualty Co. v. Tompkins,* 490 So.2d 897 (Miss.1986) (upholding punitives of $400,000 and actuals of $500, a ratio of 800 to 1) *with Prince v. Peterson,* 538 P.2d 1325 (Utah 1975) (reducing punitives from $3,000 to $1,000 where actuals were $5,537, with no explanation). The Alabama Supreme Court has noted the weakness in the list of factors used in Alabama, which is quite similar to Utah's list:

[F]or the same conduct, one insurance company and its special agent were punished by a punitive damages award of

$21,130.86 ... and another insurance company and its special agent were punished by a punitive damages award of $2,490,000.... The instruction given to the juries in those two cases were substantially the same.

... [T]he standard by which the jury is to gauge the amount of punitive damages, if any, that it is to award is incomprehensibly vague and unintelligible.... Under such a "standard," one jury can award $21,130.86 and another $2,490,000 for the same "wrong."

*Charter Hosp. of Mobile, Inc. v. Weinberg,* 558 So.2d 909, 916–17 (Ala.1990).

Many states have recognized the problems created by giving finders of fact essentially standardless discretion to award punitive damages and have legislatively determined that trial courts may not sanction punitive damage awards that exceed actual damages by a certain ratio. *See, e.g.,* Colo. Rev.Stat. § 13–21–102 (1987) (punitives cannot exceed actual damages); Fla.Stat.Ann. § 768.73(1)(a) (1989) (punitives cannot exceed three times actual damages); Okla. Stat.Ann. tit. 23, § 9 (West 1987) (punitives can only exceed actual damages if clear and convincing evidence of fraud, malice, oppression, or wanton or reckless disregard for other's rights); *see also Report on Punitive Damages* 5 n. 21.

At least one court has fixed a rough ratio ceiling by judicial decision. The United States Court of Appeals for the Fifth Circuit, in considering an award of punitive damages in an intentional business tort case under Texas law, stated, "A formula of punitive damages equal to three times compensatory damages is a fairly good standard against which to assess whether a jury abused its discretion." *Miley v. Oppenheimer & Co.,* 637 F.2d 318, 331 (5th Cir.1981).

Other states have imposed strict dollar ceilings on punitive damage awards. *See, e.g.,* Ga.Code Ann. § 51–12–5.1 (Supp.1990) ($250,000 ceiling except in cases of product liability or intentional tort); Va.Code Ann. § 8.01–38.1 (Supp.1990) ($350,000 ceiling).

The courts of both Connecticut and Michigan have judicially imposed bright-line limits on punitive damage awards. *See, e.g., Triangle Sheet Metal Works, Inc. v. Silver,* 154 Conn. 116, 127, 222 A.2d 220, 225 (1966) (limiting punitives to compensate for expenses of litigation); *Kewin v. Massachusetts Mut. Life Ins. Co.,* 409 Mich. 401, 419–21, 295 N.W.2d 50, 55 (1980) (only allowing what it termed "punitives" to compensate for "soft" or intangible harm).

The advantages of imposing bright-line ceilings on punitive awards are obvious. A ceiling provides unmistakable guidance to juries, trial courts, and appellate courts. However, the absolute ceiling approach is too mechanical and could potentially defeat the very purpose of punitive damages. *See generally* Phillips, *A Comment on Proposals for Determining Amounts of Punitive Awards,* 40 Ala.L.Rev. 1117 (1989); Mallor & Roberts, *Punitive Damages: Toward a Principled Approach,* 31 Hastings L.J. 639 (1980) [hereinafter Mallor & Roberts]. For example, strict dollar amount, percentage of the defendant's wealth, and ratio ceilings all would allow potential defendants to calculate their exposure to liability in advance, thus diminishing the deterrent effect of punitive damages. In addition, such absolute ceilings do not provide the flexibility needed to deal adequately with the type of case that involves only minimal actual damages, but where the conduct of the defendant is so flagrant as to justify a large punitive award. *See generally* Mallor & Roberts at 666–67.

Bearing in mind the weaknesses of reliance on a list-of-factors standard alone and the weaknesses created by absolute ceilings, whether legislatively or judicially created, we conclude that when considered together, the language and pattern of results from our prior cases provide a basis for finding a middle ground.[24]

---

24. *See Von Hake v. Thomas,* 705 P.2d 766 (Utah 1985); *Jensen v. Pioneer Dodge Center, Inc.,* 702 P.2d 98 (Utah 1985); *Synergetics v. Marathon Ranching Co.,* 701 P.2d 1106 (Utah 1985); *Bundy v. Century Equip. Co.,* 692 P.2d 754 (Utah 1984); *Nelson v. Jacobsen,* 669 P.2d 1207 (Utah 1984); *Cruz v. Montoya,* 660 P.2d 723 (Utah 1983); *Branch v. Western Petroleum, Inc.,* 657 P.2d 267 (Utah 1982); *Leigh Furniture & Carpet Co. v. Isom,* 657 P.2d 293 (Utah 1982); *First*

Among the seven factors we have repeatedly listed that should be considered in determining the amount of a punitive damage award is the "amount of actual damages." *E.g., Bundy*, 692 P.2d at 759. Although we have not articulated any standard for determining the importance to be assigned this factor, we have said that the amount of a punitive damage award generally must bear a "reasonable and rational" relationship to the actual damages.[25] *Id.* The punitive damage awards we have characterized as violating this "reasonable and rational" relationship rule have been labeled "grossly disproportionate" to the actual damages awarded and have been said to be the result of passion or prejudice. These awards have been either reduced by this court directly or remanded to the trial court for further proceedings. *See, e.g., Jensen v. Pioneer Dodge Center, Inc.*, 702 P.2d 98, 101 (Utah 1985).

Although vague in its articulation, an examination of the results of our cases shows that in its operation, this "reasonable and rational" relationship principle has produced some fairly predictable results. Generally, we have found punitive damage awards below $100,000 not to be excessive only when the punitives do not exceed actual damages by more than a ratio of approximately 3 to 1.[26] *See, e.g., Von Hake v. Thomas*, 705 P.2d 766 (Utah 1985); *Branch v. Western Petroleum, Inc.*, 657 P.2d 267 (Utah 1982); *Elkington v. Foust*, 618 P.2d 37 (Utah 1980); *Powers v. Taylor*, 14 Utah

2d 152, 379 P.2d 380 (1963); *DeVas v. Noble*, 13 Utah 2d 133, 369 P.2d 290 (1962); *Evans v. Gaisford*, 122 Utah 156, 247 P.2d 431 (1952).

Because of the limited number of cases considering large awards, it is more difficult to note a particular pattern once the award exceeds approximately $100,000. However, it is safe to say that these large awards appear to receive more scrutiny than the smaller awards and that the acceptable ratio appears lower. *See, e.g., Von Hake*, 705 P.2d at 772 (Stewart, J., concurring and dissenting) (majority opinion upholding $500,000 punitives—1 to 1 ratio); *Synergetics v. Marathon Ranching Co.*, 701 P.2d 1106, 1113 (Utah 1985) (Stewart, J., concurring and dissenting) (majority upholding $200,000 punitives—½ to 1 ratio). In one such case, when the ratio exceeded 2 to 1, we reduced the award on grounds of excessiveness. *See First Security Bank*, 653 P.2d at 598–99 (reducing $100,000 punitives—3 to 1 ratio—to $50,-000—2 to 1 ratio).

The general rule to be drawn from our past cases appears to be that where the punitives are well below $100,-000, punitive damage awards beyond a 3 to 1 ratio to actual damages have seldom been upheld and that where the award is in excess of $100,000, we have indicated some inclination to overturn awards having ratios of less than 3 to 1.

---

*Security Bank of Utah v. J.B.J. Feedyards, Inc.*, 653 P.2d 591 (Utah 1982); *Clayton v. Crossroads Equip. Co.*, 655 P.2d 1125 (Utah 1982); *Elkington v. Foust*, 618 P.2d 37 (Utah 1980); *Terry v. Z.C.M.I.*, 605 P.2d 314 (Utah 1979), *overruled on other grounds, McFarland v. Skaggs Co.*, 678 P.2d 298 (Utah 1984); *Kesler v. Rogers*, 542 P.2d 354 (Utah 1975); *Prince v. Peterson*, 538 P.2d 1325 (Utah 1975); *Holdaway v. Hall*, 29 Utah 2d 77, 505 P.2d 295 (1973); *Powers v. Taylor*, 14 Utah 2d 152, 379 P.2d 380 (1963); *DeVas v. Noble*, 13 Utah 2d 133, 369 P.2d 290 (1962); *Nance v. Sheet Metal Workers Int'l Assoc.*, 12 Utah 2d 233, 364 P.2d 1027 (1961); *Holland v. Moreton*, 10 Utah 2d 390, 353 P.2d 989 (1960); *Ostertag v. La Mont*, 9 Utah 2d 130, 339 P.2d 1022 (1959); *Sadleir v. Knapton*, 5 Utah 2d 26, 296 P.2d 278 (1956); *Wilson v. Oldroyd*, 1 Utah 2d 362, 267 P.2d 759 (1954); *Evans v. Gaisford*, 122 Utah 156, 247 P.2d 431 (1952).

25. Although this is only one of the factors identified by this court to date to be considered in determining an appropriate amount of damages, it is one which is more concretely definable and which we today further refine to give better guidance. We leave for another day the possibility of further refining other factors we have previously identified, as well as the possibility that additional factors may be developed as we consider particular situations presented to us in the course of reviewing trial court rulings.

26. A few cases have upheld punitives above a 3 to 1 ratio. *See Ostertag v. La Mont*, 9 Utah 2d 130, 339 P.2d 1022 (1959) (upholding punitives of $860 to actual damages of $140); *see also Falkenburg v. Neff*, 72 Utah 258, 270, 269 P. 1008, 1013 (1928) (reducing punitives to $1,500 where actuals were $362.50).

In these patterns, we find that guidelines emerge for trial courts faced with challenges to punitive damage awards on the grounds of excessiveness under rule 59(a)(5). If the ratio of punitive to actual damages falls within the range that this court has consistently upheld, then the trial court may assume that the award is not excessive. In denying a rule 59(a)(5) motion for a new trial, the trial court need not give any detailed explanation for its decision if the punitive damage award falls within this ratio range. If the award exceeds the ratios set by our past pattern of decision, the trial court is not bound to reduce it. However, if such an award is upheld, the trial judge must make a detailed and reasoned articulation of the grounds for concluding that the award is not excessive in light of the law and the facts. The judge's articulation should generally be couched in terms of one or more of the seven factors we earlier listed as proper considerations in determining the amount of punitive damages, unless some other factor seems compelling to the trial court. For example, a trial court might conclude that an award should stand, despite a ratio that is higher than we have generally approved, because the defendant displayed an extremely high degree of malice, e.g., actual intent to harm[27] or a high degree of likelihood of great harm based on the reprehensible nature of the act.[28]

In addition to articulating support for the amount of the award in terms of the relevant factors, the judge may also want to explain why the large ratio of punitives to actuals is necessary in the context of the particular case in order to further the purposes of punitive damages "by punishing and deterring outrageous and malicious conduct [or conduct which manifests a knowing or reckless indifference toward, and disregard of, the rights of others] which is not likely to be deterred by other means." *Synergetics*, 701 P.2d at 1112; *see also Behrens v. Raleigh Hills Hosp.*, 675 P.2d at 1186. In sum, the trial judge's articulation should explain why the award is not excessive despite the fact that it exceeds the general pattern of awards upheld in our prior cases. The purpose of this requirement for an articulation of reasons warranting the denial of the rule 59(a)(5) excessiveness motion is to permit more effective and reasoned appellate review of the decision to uphold the award and to enable the appellate court to more carefully consider the various factors that may warrant punitives and the weight to be accorded them, while giving adequate deference to the advantaged position of the trial judge to appraise the witnesses and the evidence. Such appellate review will presumably lead to more substantive analysis of the punitive damage standards than has been heretofore possible.

■ Should the trial court decide to either reduce or enlarge an award of punitive damages by way of remittitur or additur, it should also explain its action. *See Saltas v. Affleck*, 99 Utah 381, 386–87, 105 P.2d 176, 178 (Utah 1940) (requiring such an explanation when the trial court *grants* a new trial motion). Factors that may justify a remittitur could include the fact that the award exceeded the proper ratio, lack of intent or a low degree of malice, the benign nature of the act, the fact that a substantial portion of the actual damages is "soft," thus making the ratio analysis suspect,[29] or a substantial risk of bankrupt-

---

**27.** *See, e.g., Cox v. Stolworthy*, 496 P.2d 682, 690 (Idaho 1972) (exemplary damages in deceptive for-profit business scheme should make the cost of such repetitive antisocial conduct uneconomical), *overruled in part, Cheney v. Palos Verdees Inv. Corp.*, 104 Idaho 897, 665 P.2d 661, 667 (1983).

**28.** *See, e.g., Grimshaw v. Ford Motor Co.*, 119 Cal.App.3d 757, 174 Cal.Rptr. 348, 388 (1981) (upholding punitive award of $3.5 million for "conscious and callous disregard of public safety in order to maximize corporate profits");

*Ford Motor Co. v. Havlick*, 351 So.2d 1050, 1050 (Fla.Ct.App.1977) (upholding award of $1,740,-000 against Ford).

**29.** Our past cases, taken together, also establish a distinction between "hard" and "soft" actual damages when used as a basis in determining the appropriate amount of punitive damages. Where actual damages are largely "soft," this court has been reluctant to uphold punitive damage awards of a ratio that might survive scrutiny if the actual damages involved were "hard." *Compare Von Hake v. Thomas*, 705

ing the defendant. The articulation of grounds for a remittitur or an additur should serve the same salutary purpose on appeal as where a motion for a new trial is denied.

Returning to the present case, and applying the standards we articulate today, we conclude that we must vacate the denial of the motion for a new trial and remand the matter for reconsideration by the trial court in light of the foregoing discussion. At this time, we express no opinion as to whether a remittitur should be granted on remand. However, if one is again denied, the trial judge must explain the reasons for denial under the standards set forth above, given the large proportion of the compensatory damages arguably attributable to emotional distress or loss of financial reputation and the fact that the ratio of punitives to compensatories here appears to be much higher than in any case where we have upheld a punitive damage award.

Finally, a review of our cases leads us to observe that a motion for a new trial challenging the amount of a punitive damage award is most appropriately brought under rule 59(a)(5), while a motion challenging an award of hard actual damages is more appropriately brought under rule 59(a)(6). We note this because in reviewing damage awards in the past, this court has at times seemed to merge a rule 59(a)(5) and (6) analysis. *See generally Bennion v. LeGrand Johnson Constr. Co.*, 701 P.2d 1078 (Utah 1985); *Wellman v. Noble*, 12 Utah 2d 350, 366 P.2d 701 (1961); *Weber Basin Water Conservancy Dist. v. Skeen*, 8 Utah 2d 79, 328 P.2d 730 (1958).

A challenge to the amount of an award of hard compensatory damages, which by definition are to compensate the plaintiff for some concrete loss, is most appropriately scrutinized within a 59(a)(6) framework because subsection (6) claims "[i]nsufficiency of the evidence to justify the verdict or other decision, or that it is against the law" as ground upon which a new trial may be granted. Utah R.Civ.P. 59(a)(6). Generally, hard compensatory damages will be either supported by the evidence or not.

While it may be appropriate generally to consider hard compensatory damages under subsection (6), the case may be different with soft compensatory damages, which constitute a majority of the compensatory damages awarded in this case. At times, those may more properly be addressed under the "passion or prejudice" framework of rule 59(a)(5).

We note one final problem that could result from the standard we articulate today, which gives considerable deference to the trial court in passing on motions for new trials based on a claim of damage excessiveness. We do not wish to encourage parties who may try to bypass the trial court by appealing an excessive damage award directly without moving for a new trial and thus benefit from a less deferential standard on appeal. To avoid such an anomalous result, and because of the highly subjective nature of appraisal required in assessing the excessiveness of an award, we hold that any challenge to an award based on its excessiveness that is brought before an appellate court will be considered under the same standard articulated today for reviewing trial court decisions on motions for a new trial. If no new trial motion was filed below, we will assume that the trial court considered such a motion *sua sponte* under rule 59(d) [30] and denied the motion.

P.2d 766 (Utah 1985) *and Jensen v. Pioneer Dodge Center, Inc.*, 702 P.2d 98 (Utah 1985) *and Synergetics v. Marathon Ranching Co., Ltd.*, 701 P.2d 1106 (Utah 1985) *and Bundy v. Century Equip. Co.*, 692 P.2d 754 (Utah 1984) *and Leigh Furniture & Carpet Co. v. Isom*, 657 P.2d 293 (Utah 1982) *and Clayton v. Crossroads Equip. Co.*, 655 P.2d 1125 (Utah 1982) (all involving "hard" damages) *with Nelson v. Jacobsen*, 669 P.2d 1207 (Utah 1983) *and Cruz v. Montoya*, 660 P.2d 723 (Utah 1983) *and Branch v. Western Petroleum, Inc.*, 657 P.2d 267 (Utah 1982) *and*

*First Security Bank of Utah v. J.B.J. Feedyards, Inc.*, 653 P.2d 591 (Utah 1982) (all involving largely "soft" damages).

30. Rule 59(d) provides that "the court of its own violation may order a new trial for any reason for which it might have granted a new trial on motion of a party." Utah R.Civ.P. 59(d). If no motion was filed below and the trial court did not grant a motion *sua sponte*, the effect is the same as if the trial court had considered and denied the motion. Thus, it is reasonable for us

■ The course we take today should produce sounder decision making by trial and appellate courts. First, we plainly fix the primary responsibility of reviewing the amount of punitive damage awards on the court best equipped to perform such a review—the trial court.[31] We make it plain that the appellate court's role is to review the trial court's new trial ruling rather than the jury's verdict directly. Second, we give some context to the term "excessive" in rule 59(a)(5) through the imposition of an operatively presumptive ceiling, albeit a soft one. Finally, through the requirement of an articulation of reasons for sustaining or modifying damage awards, we establish a mechanism for the further development of the law. The express consideration of the norms by which awards are determined will promote careful review by both trial and appellate courts of the policies underlying punitive damages and the facts pertinent to a vindication of those policies on a case-by-case basis. *See Report on Punitive Damages* 13–15 (advocating a flexible formula based on the amount of compensatory damages to determine the appropriate amount of punitive damages). A sounder law of punitive damages should result.

The trial court's order denying the motion for a new trial on grounds that the punitive damage award was excessive is vacated, and the motion is remanded to the trial court for further consideration in light of this opinion. The judgment against Fire Insurance is affirmed in all other respects.

HALL, C.J., and DURHAM, J., concur.

HOWE, Associate Chief Justice (Concurring with Reservations):

I concur but write to express my reservation about some statements in the majority opinion as to when it is appropriate for the trial court to grant a new trial on the ground contained in Rule 59(a)(6), which is "[i]nsufficiency of the evidence to justify the verdict or other decision, or that it is against law." I prefer not to express any opinion as to the law governing the granting of a new trial when the motion to grant is premised on that ground. This is because Fire Insurance, in its motion for a new trial, in its argument to the trial court at the hearing on its motion, and in its brief and argument to this court, has relied only on Rule 59(a)(5), which allows a new trial to be granted when there has been "[e]xcessive or inadequate damages, appearing to have been given under the influence of passion or prejudice."

The majority opinion correctly states and applies the law governing this ground. We need not go further and attempt to restate the law governing other grounds for a new trial and examine, overrule, and criticize

---

to apply the same standard of review for punitive damage awards whether they are on appeal from a trial court's refusal to grant a new trial or on direct appeal. We note, however, that we so hold with regard to punitives only because of the highly subjective nature of punitive damage awards. By so interpreting rule 59(d) with regard to punitive damage awards, we do not intend to imply that a similar interpretation of the rule will be given as it relates to other types of damages or to other grounds upon which new trials may be granted.

**31.** Some may argue that allowing the trial court to consider in the first instance the propriety of the jury's award of punitives and to reduce or increase the award if it deems appropriate violates the plaintiff's right to trial by jury. We certainly are not advocating that the trial court substitute wholesale its own judgment for that of the jury. *See, e.g., Hancock v. Planned Development Corp.,* 791 P.2d 183, 185 (Utah 1990) (trial court has no discretion to grant new trial

absent showing of at least one circumstance in rule 59). Rather, we are recognizing that the trial judge is in a better position to determine in the first instance the appropriateness of the award.

Our holding today in no way results in the loss of a plaintiff's right to a jury trial. A trial judge, in proposing a remittitur or additur, only does so as an alternative to granting a new trial. This is true because a trial judge may only remit the damages if he or she finds them excessive or add to them if he or she finds them inadequate—which is one of the grounds for granting a new trial. Thus, if a plaintiff does not want to accept the proposed remittitur, he or she may elect to retry the matter.

In addition, as we have already pointed out, a trial judge may not substitute judgment for the jury. Rather, the judge must be able to articulate a reasonable basis for the inappropriateness of the verdict. *Wellman v. Noble,* 12 Utah 2d 350, 366 P.2d 701 (1961); *Saltas v. Affleck,* 99 Utah 381, 105 P.2d 176 (1941).

our cases arising under those grounds, especially in brief footnotes.

I also refrain from expressing any opinion as to whether a motion for a new trial which challenges an award of "hard actual damages" is more appropriately brought under Rule 59(a)(6). In addition, I fail to see how an appellant could benefit by declining to move for a new trial but instead appealing directly an excessive damage award. In fact, there is an obvious disadvantage to that strategy. Therefore, I do not think we need assume that the trial court considered and denied a motion for a new trial *sua sponte* under Rule 59(d).

STEWART, Justice (Concurring in Part and Dissenting in Part):

I agree with much of what the majority states about the standards to be employed under Rule 59(a)(5) of the Utah Rules of Civil Procedure, but I have reservations about several points in the opinion concerning the trial and appellate standards for dealing with motions for new trials, and I disagree with the ultimate disposition of the punitive damages issue. I concur in all other parts of the opinion.

The sole issue raised on appeal in this case with respect to the award of punitive damages is that they were "excessive" under Rule 59(a)(5) of the Utah Rules of Civil Procedure. Rule 59(a) specifies seven grounds for granting a new trial by a trial court. Subpart (5) provides that a trial court may order a new trial if it finds that the jury returned "excessive or inadequate damages" that appear "to have been given under the influence of passion or prejudice." The majority uses that contention of error as a springboard to launch into a sweeping, and in some instances confusing, discussion of the operation of Rule 59(a). In parts of the discussion, it appears that the majority is defining standards for all of Rule 59(a), but in other parts the majority seems to address issues that arise only under subparts (5) and (6), although the latter subpart is not before the Court and has not been argued by the parties.

I think it appropriate to note that although a verdict may be supported by some evidence, the trial court may set that verdict aside under subpart (6) if the verdict is against the manifest weight of the evidence so "that the trial judge 'cannot in good conscience permit it to stand.'" *Goddard v. Hickman*, 685 P.2d 530, 532 (Utah 1984) (quoting *Holmes v. Nelson*, 7 Utah 2d 435, 441, 326 P.2d 722, 726 (1958) (Crockett, J., concurring)). *See also Brown v. Johnson*, 24 Utah 2d 388, 391, 472 P.2d 942, 944 (1970); *Hyland v. St. Mark's Hosp.*, 19 Utah 2d 134, 137, 427 P.2d 736, 738 (1967); *Efco Distrib., Inc. v. Perrin*, 17 Utah 2d 375, 380, 412 P.2d 615, 617–18 (1966); *King v. Union Pacific R.R.*, 117 Utah 40, 45–49, 212 P.2d 692, 695–96 (1949); 6A J. Moore & J. Lucas, *Moore's Federal Practice* ¶ 59.08[5] (1991). In *Goddard v. Hickman*, 685 P.2d 530 (Utah 1984), and *Nelson v. Trujillo*, 657 P.2d 730 (Utah 1982), we held that the standard of review on appeal of an order granting a new trial under Rule 59(a)(6) is that the order will be sustained "if the record contains 'substantial competent evidence which would support a verdict for the [moving party].'" 657 P.2d at 732 (quoting *King v. Union Pacific R.R.*, 117 Utah at 53, 212 P.2d at 698).

In dealing with the standard of review that an appellate court should utilize in reviewing a trial court's grant of a motion for a new trial, the majority states that *Bennion v. LeGrand Johnson Construction Co.*, 701 P.2d 1078 (Utah 1985), is a case that has contributed to confusion with respect to the proper standard because that case stated that a "reviewing court will defer to a jury's damage award unless the award indicates that the jury disregarded competent evidence...." 701 P.2d at 1084. The majority then asserts that if that statement purports to state the standard of review by which an appellate court determines the propriety of a trial court's decision to grant or deny a new trial, it is incorrect. The majority further states:

The statement can be read to mean that this court reviews the jury's action directly, when in reality we review the trial court's action for an abuse of discretion. It is this type of loosely worded standard

which has, over time, effectively confused the appellate court's proper role in assessing the merits of a rule 59 motion attacking a jury verdict with that of the trial judge.

Maj. op. at 805 (citation omitted).

The confusion that the majority finds is based on its misreading of *Bennion*. There was no issue of the propriety of the grant or denial of a new trial motion in *Bennion*.[1] This Court was simply asked to review directly the validity of the award of damages. Although Rule 59(a) was argued by the appellant in *Bennion* as if it established standards for reversing a verdict on appeal, there was no motion for a new trial made in the trial court, and the issue before this Court was the standard for reviewing a damage award directly on appeal. In short, the majority's loose analysis is used to argue that it is necessary to restate our case law because it is inaccurate. I disagree.

Indeed, the majority contrives a strange, hypothetical procedure to justify an inappropriate standard of appellate review of punitive damage awards not reviewed by the trial court on a motion for a new trial. The majority states that in cases in which a motion for a new trial is not made and an appeal is taken directly from the award of punitive damages, an appellate court will assume that the trial court *sua sponte* considered and denied a hypothetical motion. This hypothetical motion and ruling is then made the basis for applying the same standard of review in direct appellate review of an award of punitive damages as is applied when a motion for a new trial is actually made and denied by the trial court and that ruling is then appealed. Such an approach is unnecessary and if literally applied would lead to serious difficulties. After assuming the hypothetical motion and a ruling by the trial court denying it, an appellate court must then, according to the majority, determine if the trial court would have abused its discretion in denying the hypothetical motion.

Clearly, the proper approach is for an appellate court to review the award of punitive damages straight-out in light of the various factors set out in the majority opinion for determining the reasonableness of punitive damages. Compare *Bennion*, 701 P.2d at 1084, which states that to justify a new trial for excessive damages under Rule 59(a)(5), the damage award must be "clearly excessive on any rational view of the evidence." Although that statement was not made in the context of a punitive damage award, it is an appropriate standard to be applied in light of the six relevant factors referred to by the majority to be considered in determining the validity of a punitive damage award. Applying usual appellate standards to the review of a punitive damage award is altogether sound. There is no reason to devise a fictional procedure to justify an unnecessary and inappropriate result. Given the difficulties, it is important to recognize that the majority's view is strictly dictum. There was in fact a motion for a new trial in this case.

The majority remands this case to the trial court for the trial judge to state his reasons for sustaining the award of punitive damages. In explaining the factors the trial judge may examine, the majority opinion, in my view, unduly emphasizes the relationship of the punitive damages to compensatory damages. That relationship is certainly not determinative, but is only one of many factors to be considered. In the context of this case, it is significant that our prior cases have not dealt with punitive damages awarded against a multimillion dollar corporation. Of greater significance than the relationship of the punitive and compensatory damage awards are the other factors which have been enumerated in our cases, such as the financial resources of the defendant and the likelihood that a defendant will continue its malicious conduct.

The defendant in this case argues that its net income for the year of its misconduct was $23,000,000 and that a $4,000,000 puni-

---

**1.** Although the majority notes this distinction in footnote 21, it does not explain how *Bennion* could be misread as to the proper standard of review when considering the denial or grant of a motion for a new trial when no such issue was before the Court.

tive damage award is exceptionally high compared to its net income. The defendant does not state, however, that the company's total assets are $723,468,116. Furthermore, the evidence disclosed that there are four claims offices in Utah, each handling four to five thousand claims per year. In addition, scores of other offices located in the western United States handle a similar number of claims. The defendant stated at trial that the practices which it employed in this case were sound business practices. Indeed, three of the defendant's employees who testified at trial for the defendant stated that they believed they had treated the Crookstons fairly. The claims adjuster who committed the fraud, Clapperton, stated that he felt good about what he did to the Crookstons. His record for improving company profits has apparently not been overlooked in the corporation, because the defendant has twice promoted him since his adjustment of the Crookston loss. He is now the district claims manager supervising the adjustment of all claims in northern Utah.

From the defendant's point of view, it certainly can be argued that $4,000,000 punitive damages is excessive. However, from a public policy point of view, the award is justified. In the absence of punitive damages, the defendant may well find that it is profitable to continue its illegal conduct even though it may incur the cost of compensatory damages from time to time. One may never know how many of the thousands of claims handled in Utah and elsewhere by the defendant have been subjected to the same kind of fraudulent manipulation as occurred in this case, with devastating losses to those who contracted in good faith. A $4,000,000 punitive damage award can certainly have a salubrious effect in inducing the defendant to bring its practices into harmony with common moral conduct and accepted business ethics, to say nothing of the requirements of the law.

All this, and much more justifying the punitive damage award, is on record in this case. The issue was well-tried, and the trial judge set out his views with some clarity, although not with as much detail as the majority opinion requires. In my view, since the relevant evidence is before the Court and is sufficient to justify the award of punitive damages, given the presumption of correctness that ought to attach to the jury verdict, I would affirm the award and not remand for further proceedings.

Finally, I agree that, as a general proposition, requiring an articulation of the reasons for the granting of a new trial by a trial court is sound policy. This Court said as much in *Saltas v. Affleck*, 99 Utah 381, 386–87, 105 P.2d 176, 178 (1940). However, I think the rules which require trial judges to explain the reasons for granting or not granting a motion for a new trial on the ground of excessive punitive damages should be expanded to awards that are within the three-to-one ratio that the Court suggests presumptively establishes reasonableness. A three-to-one punitive damage award may, however, be devastating for an individual or business entity with limited financial resources. I think all punitive damage awards by a jury should be justified by the trial court when there is a motion for a new trial based on the ground of excessive punitive damages.

For the foregoing reasons, I would affirm the trial judge's denial of a new trial without further proceedings. I also concur in the reservations expressed in Justice Howe's opinion.